## CHARLEY POLK v. STATE.

No. A-4415.    Opinion Filed March 13, 1924.
(224 Pac. 194.)

(Syllabus.)

1. Constitutional Law—Guaranty of Fair and Impartial Trial According to Due Course of Law. Every person charged with crime, whether guilty or innocent, is entitled to a fair and impartial trial according to the, due and orderly course of the law, and it is a duty resting upon the courts to see that the guaranty of such a trial, conferred by the laws. upon every citizen, shall be upheld and sustained.

2. Criminal Law—Right to Plead Guilty—Judgment of Conviction and Imposition of Punishment. In a criminal action a defendant has the right to plead guilty, and the effect of such a plea is to authorize a judgment of conviction and imposition of punishment as prescribed by law.

3. Criminal Law—Plea of Guilty to Be Entirely Voluntary by One Competent to Know Consequences. A plea of guilty should be entirely voluntary, by one competent to know the consequences, and should not be induced by fear, persuasion, promises, or ignorance.

4. Same—Before Plea of Guilty Accused to Be Fully Advised as to Rights and Consequences. A plea of guilty should not be entered until after the defendant has been fully advised by the court of his rights and the consequences of his plea.

5. Same—Right to Withdraw Pleas of Guilty Either Before or After Judgment, Where Reasonable Ground for Going to Jury. The defendant in a criminal action should be permitted to withdraw his plea of guilty given unadvisedly, either before or after judgment, where any reasonable ground is offered for going to the jury; and, while this is a matter within the discretion of the court, the discretion is a judicial one which should always be exercised in favor of innocence and liberty.

6. Same—Trials on Merits Favored—Judgment on Plea of Guilty Reversed, Where Refusal to Vacate Shows Abuse of Discretion. The law favors trials on the merits; and, if the discretion of the trial court is abused in refusing to vacate and set aside judg-

ment and sentence of life imprisonment, pronounced upon a plea of guilty, and grant a new trial, the judgment on appeal will be reversed.

7. **Trial—Furnishing Accused List of Witnesses for State Two Days Before Trial Mandatory.** The Bill of Rights (Const. art. 2, § 20) provides "that in capital cases, at least two days before the case is called for trial, he [the accused] shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their post office addresses," held, that under this provision of the Constitution the defendant in a capital case does not have to demand a list of the witnesses to be called in chief, because the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with, unless the defendant has waived this right.

8. **Trial—Refusal of Opportunity in Felony Case to Procure Counsel Deprivation of Right.** Under our laws every person accused of felony is entitled to aid of counsel at every stage of the proceedings, whether imprisoned or admitted to bail, and refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety.

9. **Same—Right to Be Informed of Charge and to Counsel May Be Waived but Cannot Be Denied by Court.** Under provisions of the Code of Criminal Procedure (sections 2484, 2485, Comp. St. 1921) "the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings," and "he must also allow to the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose." And under section 2590, providing that before arraignment the defendant "must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desire the aid of counsel. If he desires, and is unable to employ counsel, the court must assign counsel to defend him." Held, that while these rights may be waived by the defendant, they cannot be denied by the courts.

10. **Judgment and Sentence—Order Overruling Motion to Vacate Judgment of Conviction on Plea of Guilty and Grant New Trial Held Abuse of Discretion.** In this case the defendant, a 19 year old boy, was placed in jail on a murder charge, without the aid of counsel, he there waived preliminary examination, and was then taken to the courthouse, where, without the benefit of counsel or being informed of his rights by the court,

he entered a plea of guilty, qualified by his statement to the court which, upon the facts as stated by him, did not show that he was guilty of the offense charged, and was then by the judgment of the court sentenced to imprisonment for life at hard labor. The second day after judgment a motion to set aside the judgment and permit defendant to withdraw his plea and substitute a plea of not guilty instead was filed, which motion was by the court overruled. Held, that the overruling of the motion to vacate and set aside the judgment of conviction and grant a new trial was a manifest abuse of judicial discretion.

Appeal from District Court, Oklahoma County; James I. Phelps, Judge.

Charley Polk was convicted of murder and he appeals. Reversed.

The information in this case, filed in the district court of Oklahoma county, January 24, 1922, charges that Nathan Butler, Robert Allen, Lee Whitley, Elmer Yearta, and appellant, Charley Polk, acting conjointly and together with Oscar Smith, Robert McAlester, John Harris, and John Doe, did, January 14, 1922, willfully, unlawfully, wrongfully, and feloniously, without authority of law, and with a premeditated design to effect the death of one Jake Brooks, make an assault in and upon the said Jake Brooks, and did seize the said Jake Brooks, tie a rope around his neck, lift him from the ground, tie the other end of the rope to a limb of a tree, and release their hold of him the said Jake Brooks, then and there and thereby causing him the said Jake Brooks to be suspended in mid-air at the end of said rope, causing him then and there and thereby to be strangled to death.

It appears that defendants Lee Whitley, Elmer Yearta, and appellant, Charley Polk, waived their preliminary examinations before Justice of the Peace Donnell in the county jail on January 24, but were not represented by counsel. On the same day the information was filed in the district

court, and these three defendants were arraigned, and each pleaded guilty, but were not represented by counsel. On the same day the court pronounced judgment, and sentenced appellant, Charley Polk, to imprisonment in the penitentiary for life at hard labor.

On January 26, 1922, counsel for appellant filed a motion to set aside the judgment and for leave to withdraw the plea of guilty and submit a plea of not guilty instead, for the following reasons:

"(1) That the judgment is illegal, and not rendered according to law.

"(2) That defendant was induced by promises and threats of officers and deputies, for political and pecuniary reward, to plead guilty to the charge of murder.

"(3) That the promises have not been fulfilled, and the threats and scare used by the officers and detectives by supersuggestion has rendered his mind in a state of autohypnosis, causing him thereby to plead guilty to a charge he did not commit.

"(4) That defendant is a minor, was charged with a capital offense, was denied right to counsel, was not apprised of his legal rights, and did not waive his statutory time for judgment and sentence.

"(5) That defendant was arrested without a warrant, and arraigned before a justice of the peace and district court, was induced to and did enter his plea, and judgment was rendered all on January 24, 1922, all of which is contrary to law.

"(6) That defendant is not guilty of murder, is denied the right to interview counsel, is not confined to the county jail of Oklahoma county, nor in the state penitentiary at this time. That this motion is made within two days from his time of making his plea of guilty, and his irresponsible illusory confession.

"Wherefore, defendant asks the judgment be set aside, held for naught; that he be permitted to withdraw his plea of guilty, and enter a plea of not guilty to said charge.

"Dated this January 26, 1922.

"Charley Polk,

"By Clarence W. Myers, Attorney."

Which motion is supported by affidavits duly verified as follows:

"I, A. J. Polk, being duly sworn, upon oath states that I am the father of Charley Polk; that he was 19 years old the 21st day of January, 1922; that he is in bad health, and subject to mental aberration and periodical subconsciousness of the mind; that he was subject to spasms when a child; that several of his relatives have committed suicide from insanity; one is now under treatment for mental disorder; that defendant, Charley Polk, is easily excited, and has frequent mental hallucinations; he has not been a law violator, never been in trouble to the knowledge of this affiant; that his mind has been affected more noticeably since he has been unemployed on account of the packing house strike in Oklahoma City; that he is not a member of any union, and has been out of employment, which has added to his mental worries; that affiant has been refused the privilege of visiting or talking with his son, the defendant; that the defendant was arrested unduly, without a warrant; that upon the information and belief, the affiant states, induced to plead guilty upon representations that he would receive a full pardon from the Governor upon his plea of guilty; that he acted upon this inducement when he made his plea of guilty, but that he received instead of an unconditional pardon, a term of life imprisonment at hard labor in the state penitentiary; affiant further states that he was threatened and scared into pleading guilty; that his mind became affected and in a hypnotic condition, as a result of the flashing of papers in his eyes, while in his weakened mental condition, and he was hurriedly led before the court and made his plea of guilty while out of his right mind.

"This affiant believes defendant is not guilty of murder and should be released from imprisonment; that had he been given his legal rights he would not have entered his plea of guilty; and verily believes that his son, the defendant, should be given his right to a trial by jury, as to his sanity and guilt or innocence of the crime charged against him; that the defendant was arraigned, entered his plea, and sentenced in the same day before he could obtain advice as to his legal rights in the matter, and his plea of guilty was made while in a dazed mental condition, and with the expectations of receiving a full pardon instead of his sentence to imprisonment; that the authorities have spirited his son away, and will not inform this affiant as to his whereabouts; that he is not now in the county jail of Oklahoma county; that affiant cannot locate his son."

(The affidavit of Sealy Polk, mother of the defendant, is substantially the same as his father's affidavit.)

"I, William Forbes, being duly sworn, upon oath state that I am a brother of Charley Polk, and said Charley Polk has been living with me in Oklahoma City, and that I was present at the time he plead guilty to the charge of murder on January 24, 1922, and talked with him within five minutes after he was sentenced to life imprisonment in the penitentiary; and that his statement to me was in substance as follows: That he pleaded guilty to the charge for the reason that while he was confined in the county jail he had been approached by certain officers, who told him that, if he would plead guilty to the charge, he would be pardoned and released from imprisonment; that he acted upon these inducements and representations, pleading guilty to the charge."

"I, Bertha Lackey, being duly sworn, upon oath state that I did on January 24, 1922, talk with Charley Polk, in the county jail in Oklahoma county, Okla., about 1 o'clock, and within a short time after he was sentenced, and that when I talked with him he appeared to be, and was in a very nervous and worried condition; that he informed me that

while he was confined in jail the officers and detectives scared him by threats in order to induce him to plead guilty to the charge of murder; that they also represented to him that after he had entered a plea of guilty he would be pardoned and released from imprisonment; that he informed this affiant that the reason for him pleading guilty was, not that he was guilty, but because he had been scared and frightened to such an extent that he was not conscious of his acts at the time he entered his plea.''

''I, Josie Lackey, being duly sworn, upon oath state that I reside in Oklahoma City, Okla.; have known Charley Polk for nearly four years and have talked with him several times since he had been out of employment on account of the Butchers' Workmen strike in Oklahoma City and because of his unemployment; he has been without money on which to live, and has been extremely worried and of a high nervous temperament; that I talked with him personally a few minutes after he entered a plea of guilty to the charge of murder in the county jail in Oklahoma City, and he was, at that time, in an extremely nervous and highly excited condition, and his mind was deranged, and, while talking to me, he stated in substance as follows: That the reason he entered a plea of guilty to the charge of murder was, not because he was guilty of the crime, but because he had been scared into it by officers and detectives, who were working for the county and Governor; he stated they had scared him with papers flashed before him, which purported to be confessions of other men which implicated him in the murder; that the flashing of papers before his eyes, and the threats of the officers surrounding him, caused him to weaken to such a condition that he submitted and pleaded guilty to a crime which he did not commit; that the said Charley Polk, at the time of the conversation with this affiant, appeared to be in a hypnotic condition; that said Charley Polk further stated to this affiant immediately after his sentence to life imprisonment that they promised him everything, if he would plead guilty; they promised to let him out light; they informed him he would be paroled and released from prison, if he would but enter a plea of guilty.

"This affiant further states that she has known Charley Polk, and that he has always been a good boy, and scarcely 19 years of age; he has never been arrested, to the knowledge of this affiant, or charged with any offense prior to this time, and that he is subject to periodical subconsciousness of the mind; affiant further states that the said Charley Polk was arrested in her house by officers unknown to this affiant at this time on January 22, 1922, at noon."

"Josie Owen, being duly sworn upon oath states that I live in Packingtown, Oklahoma City; that I have known Charley Polk for the past four years; that I talked with him personally in the county jail a few minutes after he entered a plea of guilty to the charge of murder and was sentenced to life imprisonment in the state penitentiary, and he was then in a highly nervous, excited condition and a state of mental excitement; that he informed me that the reason he pleaded guilty was that he had been scared by officers and detectives; that they produced papers purporting to be confessions of other men implicating him in the charge of murder; that they advised him to plead guilty; that they informed him he would die in the electric chair, unless he pleaded guilty to this offense; that they informed him that, if he pleaded guilty, he would be paroled and pardoned, and released from prison; that he was in a state of excitement, and did not know what he was doing; that he was not guilty of the charge of murder; that they made him all kinds of promises and inducements if he would but plead guilty to the charge; that this affiant has known Charley Polk to be subject to periodical stages of mental weakness and excitement; that he was in this condition at the time he entered a plea of guilty and when seen by this affiant; affiant verily believes that he is not guilty of the charge of murder, and that he entered his plea of guilty while in a dazed mental condition; this affiant believes that he was not in his right mind when he entered his plea of guilty to the charge."

"I, Opal Collins, being duly sworn, upon oath state that I am acquainted with Charley Polk, and I have known him for several months, and I did see him in the county jail at

Oklahoma City, Okla., on January 24, 1922, about 1 o'clock p. m. and talked with him for 15 minutes; that he was worried, crying, and in a high state of mental excitement; that he informed me that the officers and detectives informed him that, if he would plead guilty to a charge of murder, they would give him full pardon immediately, and he would be discharged and released from imprisonment; that he pleaded guilty to the crime, believing fully that they would fulfill their promises; that instead of him being pardoned and released from prison he was sentenced to 99 years in the state penitentiary; that his exact words to this affiant were, 'They scared me into pleading guilty. They scared me into it.'"

The motion coming on to be heard February 1st, counsel for defendant called the court clerk and offered docket and page showing that the information was filed January 24; plea of guilty entered, and judgment pronounced on the same day.

As a witness in his own behalf, Charley Polk testified as follows:

"Q. What is your name? A. Charley Polk.

"Q. You are the defendant in this case? A. Yes, sir.

"Q. How old are you, Charley? A. Nineteen.

"Q. Were you arraigned before the district court of Oklahoma county about on the 24th day of January, 1922? A. Yes, sir.

"Q. At that time, was the information against you read to you as to what the charge was against you? A. They was something read; I don't know what it was.

"Q. And were you asked to plead guilty or not guilty? A. I was asked to plead guilty.

"Q. You pleaded guilty? A. Yes, sir.

"Q. Had you, before you had pleaded guilty to the charge, talked with any agents of the government, if you

know, such as detectives, special officers, county attorney, or assistants or sheriff or deputy sheriffs? A. Yes, sir.

"Q. Did you talk to any of these officers before you entered your plea? A. Yes, sir.

"Q. Do you know the names of any of the officers you talked to? A. No, I don't know the names of them, but I know their faces.

"Q. You know their faces? A. Yes.

"Q. You never heard any of the names? A. One was— let's see, McCloud, I think.

"Q. McCloud? A. Yes, sir.

"Q. That's all you remember? A. Yes, the other one was Jack.

"Q. Charley, make a statement, then, as to the conversation with the officers before you entered your plea. A. Well, I was talking with the officers; they told me that— well, he said: 'We are after these other boys,' and Yearta and I would come out all right; they would give us a pardon to tell—plead guilty, and, if we didn't plead guilty and come up there and all tell the judge of this court, he said, he would give us the electric chair.

"Q. Who told you that, Charley? A. It was Jack and McCloud.

"Q. Jack and McCloud? A. Yes, sir.

"Q. Was there any other inducements or any other statements made to you by any of these men? A. Well, they just offered me those to plead guilty; they said, we would get out all right, Yearta and I, he said; if we didn't, we would be to the electric chair.

"Q. Did that frighten you? A. Yes, sir.

"Q. Is that the reason you pleaded guilty? A. Yes, sir.

"Q. Are you guilty of the charge? A. No, sir.

"Q. Did you ask, at any time, any of the men who had you in custody whether or not you could get an attorney to defend you? A. Well, yes, I did, and they said that I could, and I told them I wanted one, and they never did bring one up.

"Q. They never brought any there? A. No, sir.

"Q. You don't know whether any attorney asked to see you and was refused or not, do you? A. No.

"Q. Did you have any attorney to advise you as to your—or, did anybody advise you as to your legal rights before you entered your plea of guilty? A. They told me that I—they said that if I got a lawyer and who would just get the money and all they wanted and you would come out a whole lot easier if you just pleaded guilty.

"Q. Have you made any statements to any one, since you pleaded guilty, that you did not want an attorney to defend you, and did not want to have a trial, and did not want your plea withdrawn? A. No, sir.

"Q. Why did you plead guilty to the charge?

"By Mr. Wright: We object to that as a repetition.

"By the Court: Overruled. Answer the question, please, sir. A. Because I thought I would get out of it and get a pardon, and they said I would get the electric chair if I didn't.

"By Mr. Myers: That's all."

Cross-examination by Mr. Wright:

"Q. You say Charley McCloud was there? A. Yes, sir.

"Q. Do you know Luther Bishop? A. Yes, sir.

"Q. Was he there? A. Yes, I think he was there.

"Q. Now, who was talking with you first? A. Jack.

"Q. Jack Conrad? A. Yes, sir.

"Q. Just tell this court what he said to you? A. Why, he told me—he said if Yearta and I would—he was telling about Yearta had confessed and all this, and he said if I would do the same thing we would get out all right; we would get a pardon.

"Q. Was that all he said? A. And he said if we come up here and told the judge that we wasn't guilty that he would give us the electric chair.

"Q. If you would come up and say or tell the jury you were not guilty? A. Yes, sir.

"Q. He would give you the electric chair? A. Yes, sir.

"Q. Did you believe that? A. Well, I didn't know; it was the first time I was ever arrested; I didn't know.

"Q. Did you think that if a fellow were not guilty that the judge would just send you to the electric chair? A. He said all the other boys said that I was into it; he said they had evidence that would send me to the electric chair.

"Q. Where was Charley McCloud when Jack Conrad was talking to you? A. He was in the room.

"Q. Any one else in there? A. Yes, I think there was another fellow; I don't know his name.

"Q. What did you say after Jack Conrad made this statement to you? A. Well, I told him that I wanted to get out the best way that I could.

"Q. Well, then, what did you do? A. I went in and wrote, and they had me to write this out.

"Q. And had you to write what out, and give to him? A. I told him what to write.

"Q. He wrote what you told him, then? A. Yes, sir.

"Q. Right there in that room? A. Yes, sir.

"Q. Well, now, did you have any conversation with Charley McCloud? A. No, sir; I talked to him, but that was all.

"Q. Well, what did he say to you? A. Well, he was telling me the same; he was standing there with Jack when Jack was talking to me.

"Q. Well, did Charley tell you the same thing that Jack McCloud told you? A. Yes, sir.

"Q. Now, what did he say? A. Well, he told me that I could get out of it that way; he said that was the only way.

"Q. Well, then, after they told you that, what did you say? A. I told them I wanted to get out of it.

"Q. Well, is that all you told them? A. They told me, then, they told me to come in there, and they would write a statement of it.

"Q. Write a statement of what? A. That case some way.

"Q. Who wrote the statement? A. Jack.

"Q. Did you tell him what to write? A. I told him some of the things to write; he showed me these other statements.

"Q. Well, did you read them? A. Yes, sir.

"Q. How is that? A. Yes, sir.

"Q. You read the other statements? A. Yes, sir.

"Q. Where? A. There.

"Q. Whose statements were they? A. Yearta's and Harris' and one of the negroes'.

"Q. Now, Charley Polk, isn't it a matter of fact that I wrote the biggest part of your statement? A. You wrote some of it; yes.

"Q. And didn't I sit there and write just what you told me to write? A. Yes.

"Q. And nothing else? A. Well, I don't know; I didn't get to read the statement.

"Q. Well, we read it right back to you, didn't we, each time? A. I don't remember.

"Q. I will ask you, Charley, if I didn't explain to you in detail your legal rights at that time? A. You told me that I could have a lawyer, and I said all right.

"Q. Didn't I tell you that you were entitled to the advice of a lawyer? A. Yes, sir.

"Q. And didn't I tell you that you were entitled to a preliminary hearing if you demanded it; that is, a preliminary trial? A. I don't remember that.

"Q. Charley, do you remember Mr. Short being present, this gentleman right here? A. Yes, sir.

"Q. I will ask you if he didn't advise you as to your rights? A. He told me that I had a right to get a lawyer.

"Q. And he told you other rights that you have, although you might not require all of them? A. I don't remember about that.

"Q. You don't remember anything except that you were entitled to the advice of a lawyer? A. Yes, sir.

"Q. And what did you say? A. Well, they told me—they said lawyers just wanted to get your money; that's all they are after.

"Q. I will ask you if you didn't tell Chris Madsen there, at that time, in the El Reno jail that you didn't know anything about this motion being filed in this court; that you didn't care anything about it; that you didn't want it filed; that you had a square deal; that you were guilty of this charge; and that you were willing to take your punishment? A. No, sir, I didn't tell him that.

"Q. Well, did you tell him that in substance? A. No, sir.

"Q. Have you ever been arrested before? A. No, sir.

"Q. Were you frightened at the time that you made this statement to these—(Counsel interrupted.) A. Yes, sir.

"By the Court: Was there any effort by any one, while you were in custody, trying to keep you from getting a lawyer? A. Well, they just told me I could have one, and I told them I wanted to see one, and they never would bring them up.

"By the Court: Well, did you tell who you wanted to see? A. I told them I wanted to see Giddings or Rose; that was all the lawyers I knew.

"By the Court: Before you entered a plea? A. Yes, sir.

"By the Court: Before you pleaded guilty to this charge? A. Yes, sir.

"By the Court: You told them you wanted to see a lawyer? A. Yes, sir.

"By the Court: And you told them who you wanted to see? A. Yes, sir.

"By the Court: What did they say about it, as to that? A. They never said anything; they just went on.

"By the Court: Did you ever ask the jailer or any of his—any of the deputies over there to send you a lawyer? A. Not only that inside, that man in there with the keys; I told him to tell them to send me a lawyer; I told them in the cages there."

George F. Short testified for the state:

"By Mr. Wright: Q. You are Assistant Attorney General of this state? A. I am.

"Q. Mr. Short, you are assisting in the prosecution of the case of Nathan Butler and others? A. I am.

"Q. Were you present at any time when Mr. McCloud or Jack Conrad or others were talking with Charley Polk? A. I was.

"Q. And state whether or not any threats or promise was made in your presence by either Mr. Conrad or Mr. McCloud or any other one representing the state? A. No such threat

was made against this boy or any other person incarcerated in the county jail since I have been there, nor was any promise offered this boy in my presence. On the contrary, I myself have talked with him a number of times. I have talked with each of the boys who have been arraigned before this court. I had several conversations with this boy, both before his plea of guilty and since his plea of guilty.

"Q. Were you present at the time that Charley Polk was arraigned, he and Lee Whitley and Elmer Yearta? A. I was.

"Q. State, if you will, what statements were made by any one representing the state there and these defendants. A. These men were brought before Justice T. F. Donnell, justice of the peace, in what's practically called the north room of the county jail; it was explained very patiently to them the nature of the proceedings; the preliminary information was read; they were told that they might have 24 hours in which to plead; they were told that, if they desired the services of a lawyer, they might see one; they might send for one. I personally talked to this young man, and asked him if he wanted to see a lawyer, I wanted a lawyer to come and see him; he said: 'I think I do.' Well, I said: 'Who do you want?' He said: I don't know.' I said: 'We will wait, and, if you want a lawyer, you tell me who you want, and I personally will see that any lawyer you name is brought to the county jail, if he will come.' A. That was just after he was arraigned before the justice of the peace, and he had stated to the justice finally that he wanted to waive his preliminary trial and wanted to get the matter over with as soon as he could, and wanted to come before the district court as soon as he could. After he had made that statement, in order that the boy might be fully apprised of all his rights, I talked to him, and he stated, as I have said, that he thought he wanted to see a lawyer. Then I asked him who he wanted to see, and he said he didn't know; I said to him, 'I will come back to see you, and if you will tell me who you want I will see that he is called; if he will come, he shall be here.' I have repeatedly asked this young man

if he has ever asked for any one to be sent for and the jailer refused to send for him, as I have asked every other person in the county jail.

"Q. What reply did he make to that? A. He told me that he had not sent for any one, and said that he didn't know what lawyer he did want to talk to; I went back to see him, afterwards, and asked him if he wanted to talk to a lawyer, if he had decided on who he wanted to see or if he wanted to see any other person. He said: 'No, I want to get it over with just as soon as I can.' I then told him he could be arraigned before the district court that day, and he said, 'That's what I want to do.'

"Q. Mr. Short, you have kept up with the investigation rather closely from the time you have entered it? A. I have attempted to.

"Q. I will ask you if at any time or at any place you heard any officer or any one else purporting to be an officer or representing the state make any promise or any threat to Charley Polk in any way, in consideration of his plea of guilty? A. I have not. On the contrary, every conversation that I have heard, both directly and with any officer of this county or state, has been such that any men of common understanding would know that officers talking to him was not making any promises to him, but, on the contrary, had told him repeatedly, 'You will be taken into the district court,' is all that the officers could do, and no person but the district court or nobody but the Governor could reduce his sentence or have it stayed.

"By Mr. Wright: That's all.

"By Mr. Myers: That's all.

"By Mr. Short (the witness): Judge, pardon me, but I would like to make this statement further.

"By the Court: All right.

"By Mr. Short (the witness): It has been called to my attention that this young man did not know these various

things had been filed; he had said he did not want a new trial, but, on the contrary, was satisfied that his plea of guilty had brought him merciful treatment; I think Charley feels so; anyhow, I talked to him on yesterday; at that time I asked him who, if any one, had mistreated him since he had been first arrested; he told me no one had; I asked him, then, who, if any one, had threatened him, and he told me that he didn't want to tell me who all, but that he wanted a chance to tell the judge who it was; I said to him then, 'Its my business to know whether or not the officers of this county mistreat prisoners in jail, and I want to know whether or not anybody has mistreated you, and I want you to tell me, and tell the court if any one has.' 'Well,' he says, 'Nobody has mistreated me, but Jack promised me something, and hasn't delivered it.' I said: 'Who? Jack who?' He was not quite sure who the Jack was, and I suggested the name of Jack Conrad to him. 'Yes, I think that's the man. I know Jack,' he said. 'What did Jack promise you?' 'Well,' he said, 'if I would plead guilty, that he would get me a pardon, or that I would get immunity, or that I would get off, and that, if I didn't, I would get the electric chair.' I then asked him where that conversation took place. He said it was over here; he was over in the jail; that they were three or four of the officers around, maybe more, and named Mr. Bishop and Mr. McCloud as those who were there at the time of the conversation. I specifically asked him whether or not Mr. Bishop had mistreated him, had threatened him in any way, or held out any promises to him, or had urged him to plead guilty. He told me that Mr. Bishop had not. I named Mr. McCloud, and asked him practically the same questions as to Mr. McCloud. He told me Mr. McCloud had not. I asked him specifically as to Mr. Wright, because Mr. Wright and I had been very closely associated in this prosecution, and he told me that Mr. Wright had not. I asked him as to Mr. Hughes; I asked him as to Mr. Dancy; I asked him as to every officer who had been in the county jail, to my knowledge, and he denied that any of those had been stated repeatedly that he wanted to tell the court about it. I said

to him, 'You shall certainly have an opportunity to tell the court, and I want you to tell him practically any mistreatment you have received.' Now, his statement to me was that Conrad had promised him he would get him a pardon. I had other conversations with him, but that's all, I think, that may be material."

Charles McCloud testified:

"Q. Mr. McCloud, were you present at the county jail when the defendant, Charley Polk, was brought in? A. Yes, sir.

"Q. Were you present when you and Jack Conrad and others talked with Charley Polk in the Bertillon room in the county jail? A. Yes, sir.

"Q. Did you, or Jack Conrad in your presence, at that time and place make any offer of immunity of any kind to Charley Polk in consideration of his plea of guilty? A. No, sir.

"Q. Did you or Jack Conrad, at that time and place make any threat of any kind or character against the defendant? A. No, sir.

"Q. To induce him to enter a plea of guilty? A. No, sir.

"Q. Did he at that time make a confession of his participation in the offense? A. He did.

"Q. State whether or not he did that voluntarily, free of any threat or promise? A. He did.

"Q. Mr. McCloud, I wish you would tell the court if you know of a single threat of any kind or character by any officer or any one assisting any of the officers or telling him of any promise that was made by any of these people in consideration of a plea of guilty, not only to the defendant, but any of the boys? A. There were no threats made, none whatever, and each, I think, each and every one was fully advised of the statute covering the crime, that it meant life in the penitentiary or the electric chair.

"Q. I will ask you if—or, state whether or not the advice was given these men before any statement was made by them? A. It was.

"Q. Were you present at the time Charley Polk made his first confession? A. Yes, sir.

"Q. And then was it reduced to writing? A. Yes, sir.

"Q. Do you recall who was present at that time? A. Luther Bishop and Jack Conrad and myself were present, as I remember, when he first admitted being implicated in this crime; there might have been others, but I am not positive as to them.

"Q. Do you recall who was present or how many people were present at the time of the arraignment before the justice of the peace? A. Well, I can't say as to all; J. K. Wright, George Short, and Justice Donnell, Luther Bishop, and some newspaper boys. I don't know how many, but some of the newspaper boys were there, and the county attorney, Hughes, and, I believe, Under Sheriff Lindsey, and, as I remember, Sheriff Dancy and the three boys, and I don't know—I do remember, though, that they was advised, advised of all their rights by, I think, at least four men, including Attorney General Short, J. K. Wright, Justice Donnell, and County Attorney Hughes."

Cross-examination by Mr. Myers:

"Q. Who employed you to investigate this?

"By Mr. Wright: If the court please, that statement, that's immaterial who employed him.

"By the Court: Sustained."

Jack Conrad testified:

"Q. Were you present in the Bertillon room in the county jail when he made his confession of his participation in this crime? A. I was when they started; when he first told it.

"Q. Did you at that time or prior to that time make any promise of any kind or character or immunity of any kind? A. I did not.

"Q. To this defendant, in consideration of his plea of guilty? A. I did not.

"Q. Did you make any threat of any kind or character against the defendant? A. No, sir.

"Q. If he would give in a plea of guilty? A. No, sir.

"Q. Did you hear any one else make any such promise or threat? A. I did not.

"Q. Was there anything done or said by you or any one in your presence that coerced or influenced this boy to enter his plea of guilty? A. No, sir.

"Q. Was his admission there free and voluntary? A. It was.

"Q. Do you recall who was present at that time? A. Luther Bishop, Charley McCloud, and myself.

"Q. Was there anything done or said that would prevent him from acting freely and of his own accord? A. No, sir.

"Q. Did any one in your presence tell the defendant Charley Polk what he must say? A. No, sir.

"Q. Or should say? A. No, sir; there was not.

"Q. Now, did you read to Charley Polk the confession of any of the other boys? A. I did not.

"Q. Did you show—did you show the confession of any of the other boys to Charley Polk? A. I did not."

Luther Bishop testified:

"Q. I will ask you to state to the court whether any one in your presence at that time and place made any promise of any kind or character to the defendant, Charley Polk, in consideration of his plea of guilty? A. They did not.

"Q. Was there any promise of any kind made at any time to this boy in consideration of his plea of guilty that you know of? A. There was not.

"Q. Luther, was there anything done by you, Jack Conrad, Charley McCloud, or any one else that would in any way prevent this defendant, Charley Polk, from acting freely and voluntarily and of his own accord? A. There was not."

J. K. Wright testified:

"By Mr. Short: Q. State your name, please. A. J. K. Wright.

"Q. What official position, if any, do you hold? A. Assistant county attorney of this county.

"Q. Did you arraign Charley Polk, the defendant in this case, before Justice Donnell on January 24th? A. I did.

"Q. What conversation did you have with him at that time, if any? A. I had no conversation with him, personally, at all. All three of the boys were arraigned; the preliminary information read to them and immediately following the reading of the preliminary information I advised them, and each of them, that they were entitled to the advice of counsel, 24 hours in which to plead, and that if they desired, why, they could enter a plea of not guilty, and as soon as could give them a preliminary hearing or they could waive that, and then immediately brought them to the district court after the filing of the final information; the only conversation that I had and that was the statement that I made to the three of them being arraigned.

"Q. Did Mr. Polk thoroughly understand that before he waived his preliminary trial? A. He was asked if he did understand it, and he gave his assent that he did. I not only advised him myself, but you gave him the same advice and Mr. Hughes, and I know that we three did; I don't know whether any one else did or not, but we three, I am sure, did, and the judge or the justice of the peace did; yes.

"Q. Have you at any time, Mr. Wright, promised him any immunity or offered him any inducement to enter his plea of guilty? A. I certainly did not."

Mr. Clarence W. Myers, as a witness on behalf of the defendant, testifies as follows in narrative form:

"I represent Charley Polk. I would like to make a statement that Charley Polk was arraigned and pleaded guilty on the 24th of January, 1922. At about noon of that day there to came to my office in the Huckins Estate building two ladies; one by the name of Bertha Lackey or Josie Lackay, and one by the name of Josie Owen, who informed me that they were friends of Charley Polk and knew him, and that they had just come from the jail where they had been talking to him. I informed them that I could not represent him upon their statements, as he was 19 years old and a minor, but to bring his parents to my office. They then hired a car and drove 12 miles and got the parents of this boy, and brought him to my office about 3:00, about 3:00 or 4:00 o'clock that afternoon.

"The parents then employed me to defend their son which I have so prepared. They said they were poor people, renting 40 acres of land on the South Canadian river and didn't have any money, but had $5, all that they had, but they would try and get more during the fall, and would pay me a reasonable fee if I would represent them, their son; that they were satisfied that he was not guilty of this crime. Then I took the father of this boy on the 26th of January, and came to the county jail. I asked the jailer if I could see Charley Polk; he told me that I would have to see Mr. Dancy, and I then went to the sheriff's office, and inquired as to where Mr. Dancy was. I could not locate him that evening. The next day Mr. Polk and I went to the courthouse to find Mr. Dancy. They informed us he was in the federal court, so his father and myself went to the federal building and saw Mr. Dancy up there. Mr. Dancy said that Charley Polk was not in the county; I said could he tell us where he was, and he said he could not say, but he was in

another county; that he was all right and was doing well. I then asked him if he was in the penitentiary yet, and the father wanted to know and he said, 'No,' he was not in the penitentiary; he could not say where he was. I then talked to his mother, who informed me that he was of a weak mind a good deal of the time; was easily frightened and easily scared; he always had been since he was small, and that she was satisfied that, inasmuch as he had never been arrested and was always a good boy, he surely was not guilty of the crime. I then prepared the affidavits of the witnesses appended to this motion. I knew that he was a minor and charged with a capital offense, and I knew that they had denied me the right to see him, and I knew that I did not think that he was apprised of his legal rights or he would not have pleaded guilty, from his own statement to the court. I then endeavored to locate my client again, so I went to El Reno on last Saturday; I had never seen him; then I went to the county jail; I asked the jailer if I could see Charley Polk; he said that he was not allowed to put out any information. I went Saturday afternoon to Sheriff Dancy and talked with him that evening, and told him that I had been to El Reno and that I ascertained that Charley was in the jail, and that they told me he was not. The sheriff then informed me that he would try and have Charley over here in a day or so, and I could see him then. I asked him if he could not give me an order to go back and see Charley that evening or Sunday. He told me that he thought that the rules used in the county jail at El Reno would not permit me to see him on Sunday. That was on Saturday. On Sunday, then, and I did not see him, and the first time I ever saw him was when Charley Polk was in the county jail yesterday morning about 9:00 o'clock when I went there with his father. I believe that the statements that I made in the motion are true, and I believe that he is not guilty of murder and that he should have a trial, and I have been paid but $5, and I am not defending him for the money that's in it, but I believe that as an attorney of the bar it is my duty to investigate and to represent him if he is not guilty.

"By the Court: What further?

"Mr. Myers: That's all.

"Mr. Wright: That's all.

"By the Court: The motion will be overruled. Exception allowed."

On the following day a motion for new trial and rehearing was filed on the ground that the proceedings were illegal and void, and that the judgment and sentence was in violation of defendant's rights under both the state and federal Constitution as guaranteed by sections 2, 6, 9, 17, 19, 20, 21, and 30 of the Bill of Rights, article 2 of the State Constitution, and articles 1, 2, 4, 5, 6, 8, 9, and 14, Amendments to the Constitution of the United States, and section 2, article 4, of the Constitution of the United States, that said defendant has been denied the benefit of counsel and deprived of his liberty without due process of law, that all of said proceedings were in violation of defendant's legal and constitutional rights, which motion was by the court overruled and exception allowed.

Clarence W. Myers, for plaintiff in error.

The Attorney General, for the State.

DOYLE, J. This appeal is from a judgment of conviction of murder and sentence of imprisonment for life at hard labor, rendered upon a plea of guilty, entered by appellant, Charley Polk, upon his arraignment on an information charging him and others with the murder of one Jake Brooks.

Counsel for appellant on the second day after judgment was rendered filed a motion to set aside the judgment and permit appellant to withdraw his plea of guilty and substitute a plea of not guilty instead, which motion was by the court overruled.

To reverse the conviction appellant assigns errors, in substance as follows: That the court was without jurisdiction to render said judgment; that the order of the court in overruling the motion to set aside the judgment and grant a new trial was contrary to law, and was an abuse of the court's discretion; that the court erred in not informing appellant of his right to have counsel before being arraigned, and in not asking him if he desired the aid of counsel as required by law; that the court erred in not appointing a time for pronouncing judgment as required by law; that the court erred in failing to ask appellant before judgment if he had any legal cause to show why judgment should not be pronounced against him.

It appears the homicide was committed January 14, 1922; appellant, then a few days over 19 years of age, was arrested January 22 and placed in the county jail at Oklahoma City. January 24 a justice of the peace, with counsel for the state, appeared in the county jail; there the defendants Lee Whitley, Elmer Yearta, another 19 year old boy, and appellant, Charley Polk, each waived preliminary examination, and were then taken from the jail to the courthouse. In the meantime the information was filed in the district court, Judge Phelps. presiding. Thereupon the following proceedings were had:

"Mr. Hughes (county attorney): I desire to read the information in this case, if the court please, and arraign three of the defendants.

"The Court: All right; all the defendants present in the court may stand up. Proceed, Mr. Hughes. (Mr. Hughes reads the information.)

"Mr. Hughes: The defendants we are now arraigning are Lee Whitley, Charley Polk, and Elmer Yearta. There were five men bound over, if the court please, but, for dif-

ferent grounds and different reasons I will tell the court of later, we will arraign the three white men at this time, and arraign the colored persons later.

"The Court: Lee Whitley, is that your correct name?

"Defendant Whitley: Yes, sir.

"The Court: Do you desire to enter a plea to the charge? That is, to announce to the court whether you are guilty or not guilty?

"Defendant Whitley: I am guilty, but I would like to make a statement.

"The Court: Well, just a minute. You understand, do you, it is for the court to either send you to prison for life or to the electric chair, if you enter a plea of guilty?

"Defendant Whitley: Yes, sir.

"By the Court: Understanding that you still desire to enter a plea of guilty, do you?

"Defendant Whitley: Yes, sir.

"The Court: Have any promises been made you or inducements offered you to enter a plea of guilty?

"Defendant Whitley: No, sir.

"The Court: You do it of your own free will and accord, understanding the consequences?

"Defendant Whitley: Yes, sir.

"The Court (to defendant Charley Polk): Mr. Charley Polk, is that your correct name?

"Defendant Polk: Yes, sir.

"The Court: Do you desire to enter a plea to the charge against you?

"Defendant Polk: Yes, sir.

"The Court: What is that plea?

"Defendant Polk: Guilty.

"The Court: And, repeating the same questions that I have just repeated to Mr. Whitley, how do you answer those questions? Just as he did?

"Defendant Polk: Yes, sir.

"The Court: You understand, do you, that the consequences are very serious?

"Defendant Polk: Yes, sir.

"The Court: And, understanding that, you desire to enter a plea of guilty?

"Defendant Polk: Yes, sir.

"The Court: You do it of your own free will and accord?

"Defendant Polk: Yes, sir.

"The Court: Nobody has offered you any inducement or persuaded you to enter the plea of guilty?

"Defendant Polk: No, sir.

"The Court: You do it of your own volition?

"Defendant Polk: Yes, sir.

"The Court: Charley Polk, do you desire to make any statement?

"Defendant Polk: Yes, sir.

"The Court: All right.

"Defendant Polk: I come up by the Union Hall there, and the bunch was fixing to go where they were going, out in front of the Union Hall; this Yearta boy, Elmer Yearta, was standing there at that time; I says, 'Where are you going?' He said: 'We are going over to a dance,' and he said, 'We are going to break up this dance some way,' and so I got in the car, and they said they was going to be some other cars, and I got in the car, and went from there and across on up to meet the first car, and they was all

right there, and I think one car got there, and they come on down where we was, and we waited awhile for the others, and Nathan says they would come down; he said he knew where one colored fellow lived; he said he knew where this fellow lived or worked out there, so, when we got down to the other car, I don't know what else they said, and went on out there, and they stopped up back of his house, about a block, I guess, and some of them went back to the house, and waved for the last car, and I didn't know what they was going to do, and I asked one of the boys: 'What are they going to do?' He said he didn't know. Nathan come back to this car, and told me, he said, 'Go and get in Harris' car,' and I went and got in the back seat of Harris' car, and they drove up in front of this house; then that boy got out and went to the door and knocked on the door, and this nigger come out, and they brought him out there and put him in the back seat with me; he asked me 'What are they going to do with me?' I says 'I don't know.'

"The Court: Let me interrupt you to ask you if the party who brought him out, did he have a gun drawn on him?

"Defendant Polk: I think he did; he came like this (indicating).

"The Court: And he came out against his will, then?

"Defendant Polk: Yes, sir.

"The Court: All right.

"Defendant Polk (continuing ): And he got in the car, and we went on down Fourth street and turned south, and drove on down and went under that bridge until we struck the Boulevard, and went out to where they stopped, and they was two of them went up to Lee's car and come back and started the car any way, and drove on up there where they hung him, and these boys, they got out of the car, and he asked again, 'What are they going to do with me?' I said, 'I don't know; I don't know what they are going to do with you.' And he said, 'Don't let them kill me'; and I said,

'I will do all I can.' And they got out of the car, and I didn't think they was going to hang him. When I got out there, this nigger said he was going to lynch him, and him and Nathan was talking, and Nathan said, 'I told you I would get you.' And this colored fellow says, 'Well, Nathan, I was drunk'; and he says, 'That don't make any difference or don't help you a bit,' and he took him, and led him out there, and he got out there. He said, 'Who has got a rope?' And some one said, 'There is one in John Harris' car,' and he told this man Allen to go and get it, and he went and got the rope and brought it over there, and Nathan tied it to the tree.

"The Court: Nathan tied the rope in the tree first?

"Defendant Polk: Yes, sir.

"The Court: Did he have to climb the tree?

"Defendant Polk: Well, he just jumped up and caught it in his hand, and tied the rope, and then, when he tied his hands first, he tied the rope to the tree, and fixed the knot, and told this nigger to get his damn head under there; this nigger was trying to talk to him, you know, and he told him—he said he didn't have any time to fool with him, and told him to get his head under there, and he put his head in the rope, and, let's see—there was two boys, this Allen and Nathan got hold of each leg, and one of the boys got hold of the end of the rope, and they strung him up and they held him up there until he died. He said, 'Good-bye, boys,' and when he said that we just turned and walked off. I told them, 'Boys, if you do whip him, whip with the rope, and not hang him,' and Nathan said, 'We are going to hang him.' He said he wouldn't take any more grub from his babies.

"The Court: He said what?

"Defendant Polk: He said he wouldn't take any more grub from his babies.

"The Court: Did you do anything to prevent them from hanging him?

"By Mr. Polk: Nothing, only said it would be best not to hang him.

"The Court: What did you do towards helping to hang him? Did you also help boost him up?

"Defendant Polk: No, sir.

"The Court: What did you do?

"Defendant Polk: I didn't do anything to help hang him.

"The Court: You stood by and watched them do it?

"Defendant Polk: Yes, sir.

"The Court: How many of them lifted him?

"Defendant Polk: Two.

"The Court: And then how many pulled on the rope?

"Defendant Polk: There was three, I think, pulled on the rope.

"The Court: How many automobiles were there in the party?

"Defendant Polk: Two.

"The Court: Well, did you—how many guns did you see?

"Defendant Polk: Two guns.

"The Court: All right.

"The Court: The union officials and officers knew nothing about this arrangement between you boys, I suppose, did they? Did they or did they not?

"Defendant Polk: I don't know if they did; I didn't know it if they did.

"The Court: I will ask all three of you boys just the same question: Did you think that it was the proper method of winning the strike by taking the life of a strike breaker?

"Defendant Whitley:   No, sir.

"Defendant Polk:   No, sir.

"Defendant Yearta:   No, sir.

"The Court:   Well, the story that you boys have told convinces me beyond any question that although you may not have helped to swing the boy to the tree, or the fellow to the tree and take his life, that you were just as guilty as those who did, and your conduct, as related by yourselves, I think, richly merits for you the electric chair.   Mr. County Attorney, have you anything to say?

"The Court:   The question as to whether the strike wins or loses, or the question as to which should prevail, the union or the open shop, has absolutely nothing to do with this case.   The question before this court is:   Shall the laws of the country be upheld?   shall the people be required even under the stress and pressure of excitement to obey the law, as good citizens, or shall they brush the laws of the country aside and take the laws into their own hands?   It's not a pleasure to this court to inflict punishment upon you young men, because you are young men; you are capable of better things and capable of a better end than that to which you have come. Upon the recommendation, however, of the county attorney and his assistants and the Assistant Attorney General, who have investigated the matter thoroughly, it will be the sentence that each of you will be sentenced to the state penitentiary at McAlester for life.

"The Court (to defendant Polk):   Mr. Polk, it is the judgment and sentence of this court that you be taken from the bar of this court to the county jail, and from there to the state penitentiary at McAlester, where you will be required to serve at hard labor for the period of your natural life.

"The Court: That will be all.   You will now be in charge of the sheriff."

The motion to vacate and set aside the judgment and for leave to withdraw the plea of guilty and to enter a plea of not guilty was filed January 26, the second day after judg-

ment was pronounced orally, and two days before the written judgment was signed by the presiding judge and filed by the court clerk.

The grounds of the motion are that the judgment is illegal and not rendered according to law; that defendant was induced by promises and threats of officers and detectives to plead guilty to the charge of murder; that defendant, a minor, charged with a capital offense, was denied the benefit of counsel, and was not apprised of his legal rights, and did not waive his statutory time for judgment and sentence; that defendant is not guilty of murder.

February 1, 1922, upon a hearing on the motion, said motion was overruled and denied. Exception reserved.

No briefs have been filed, and there has been no appearance on behalf of appellant in this court; however, we have given this case that careful study which its importance requires. On the record before us we are convinced that this defendant was not accorded a trial in conformity to the laws of this state.

In the Bill of Rights are these provisions:

Sec. 7. "No person shall be deprived of life, liberty, or property, without due process of law."

Sec. 17. "No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination."

Sec. 20. "In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: Provided, that the venue may be changed to some other county of the state, on the application of the accused, in such manner as may be prescribed by law. He shall be in-

formed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf. He shall have the right to be heard by himself and counsel; and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their postoffice addresses.''

In the Code of Criminal Procedure are these provisions:

''When the defendant is brought before a magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and also of his right to waive an examination, before any further proceedings are had.'' Section 2484, Comp. Stats. 1921.

''He must also allow to the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose; and must, upon the request of the defendant, require a peace officer to take a message to such counsel in the county or city as the defendant may name. The officer must, without delay, perform that duty, and shall receive fees therefor as upon a service of a subpoena.'' Section 2485, Comp. Stats. 1921.

''The magistrate must without a jury, immediately after the appearance of counsel, or if none appear and the defendant require the aid of counsel, after waiting a reasonable time therefor, proceed to examine the case.'' Section 2486, Comp. Stats. 1921.

''At the examination the magistrate must, in the first place, read to the defendant the complaint on file before him. He must also, after the commencement of the prosecution, issue subpoenas for any witnesses required by the prosecutor or the defendant.'' Section 2490, Comp. Stats. 1921.

"When the indictment or information is filed, the defendant must be arraigned thereon before the court in which it is filed, if triable therein; if not, before the court to which it is removed or transmitted." Section 2577, Comp. Stats. 1921.

"If the defendant appear for arraignment, without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desire the aid of counsel. If he desires, and is unable to employ counsel, the court must assign counsel to defend him." Section 2590, Comp. Stats. 1921.

"If, on the arraignment, the defendant require it, he must be allowed until the next day, or such further time may be allowed him as the court may deem reasonable, to answer the indictment or information." Section 2595, Comp. Stats. 1921.

"The court may, at anytime before judgment, upon a plea of guilty, permit it to be withdrawn, and a plea of not guilty substituted." Section 2621, Comp. Stats. 1921.

"If the defendant refuse to answer the indictment or information by demurrer or plea, a plea of not guilty must be entered." Section 2627, Comp. Stats. 1921.

"After a plea or verdict of guilty, * * * the court must appoint a time for pronouncing judgment.

"The time appointed must be at least two days after the verdict, if the court intend to remain in session so long; or, if not, at as remote a time as can reasonably be allowed." Sections 2759, 2760.

"When the defendant appears for judgment, he must be informed by the court, or by the clerk under its direction, of the nature of the indictment or information, and his plea and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him." Section 2768.

"If no sufficient cause be alleged or appear to the court why judgment should not be pronounced it must thereupon be rendered." Section 2770.

"An appeal to the Criminal Court of Appeals may be taken by the defendant, as a matter of right, from any judgment against him; and upon the appeal, any decision of the court, or intermediate order made in the progress of the case may be reviewed." Section 2805.

A plain reading of these provisions is conclusive of the questions presented by the record, and it is affirmatively shown by the record that these requirements of the Constitution and the statutes were not complied with. It is apparent from the record that appellant was not sufficiently advised of his rights by the trial judge. He was not informed of his "right to a speedy and public trial by an impartial jury of the county," and that in case he was tried by a jury and found guilty of murder the jury in its discretion would have the right to decide whether the punishment to be imposed should be death or imprisonment for life.

The record affirmatively shows that the trial court did not inform him of his right to have counsel before being arraigned, and did not ask him if he desired the aid of counsel, or inquire as to whether or not he was able to employ counsel, or advise him that, if he was unable to employ counsel, it was the duty of the court to assign counsel to defend him, nor was he informed by the trial court that he must be allowed at least one day to answer the information, unless he waived this right.

It was affirmatively shown that appellant was not accorded his constitutional right of representation by counsel until after judgment and sentence, and that he did not waive the same. The right of the accused to the assistance of counsel has long been regarded in this country as essential to the due administration of justice in criminal cases.

Says Mr. Cooley:

"With us it is a universal principle of constitutional law that the prisoner shall be allowed a defense of counsel." Const. Lim. 334.

In cases of this kind, where the defendant is charged with a capital offense, he should have the advantage of every right which the law secures to him upon his trial.

The record does not show that appellant was at any time furnished with a list of the witnesses to be called in chief to prove the allegations of the information, together with their post office addresses, or that he was served with a copy of the information, nor does the record show that he waived these constitutional rights.

In State v. Frisbee, 8 Okla. Cr. 406, 127 Pac. 1091, it is said:

"That the provision of the Constitution requiring that in capital cases a defendant shall have the right to have at least two days' notice of the list of witnesses to be used in chief against him, together with their post office addresses, confers a valuable right upon a defendant in a capital case cannot be denied."

And that:

"It is the duty of the courts to protect a defendant in a capital case in the full enjoyment of this right."

In Spess v. State, 13 Okla. Cr. 277, 164 Pac. 131, it is said:

"Under the last provision of this section of the Constitution the accused in capital cases does not have to demand a list of the witnesses together with their post office addresses, but the Constitution makes that demand for him. And, unless he waives it, he cannot be legally put upon trial until that demand has been complied with."

In Goben v. State, 19 Okla. Cr. 220, 201 Pac. 812, it was held:

"That under this provision of the Constitution the defendant in a capital case does not have to demand a list of the witnesses to be called in chief, because the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with, unless the defendant has waived this right."

It is undoubtedly the law that the accused in any criminal action is entitled, as a matter of right, to require in the first instance a compliance with the ordinary rules and forms of law that secure to him a fair and legal trial.

It appears from the testimony taken on the motion to set aside the judgment that from the time appellant was arrested and placed in jail and until after the judgment was rendered he was held practically incommunicado, and was not permitted to see his father and mother. It is conceded that he told the officers he wanted to see a lawyer; that he signed a written statement which the witnesses for the state refer to as a confession; however, this alleged confession was not introduced in evidence.

It may be well for us to say here that we do not determine whether or not the proceedings had in the county jail before the examining magistrate was a sufficient compliance with the requirements of law to give the district court jurisdiction, because the record of the proceedings before the committing magistrate is not before us. In view of another trial the question can be raised by motion to set aside the information.

The general power of a court to reconsider its judgment and sentence, and reverse, vacate, or modify it at any time during the term in which it was rendered, or to increase or diminish the sentence which it has imposed, where the original sentence has not been executed or put in operation, is undeni-

able.  Bish. New. Cr. Proc. par. 1288, and cases cited.  This power is inherent in all courts of record.  Rupert v. State, 9 Okla. Cr. 226, 131 Pac. 713, 45 L. R. A. (N. S.) 60.

It follows that it is within the discretion of the trial court to vacate a judgment of conviction rendered on a plea of guilty and to permit the plea to be withdrawn.  Heath v. State, 23 Okla. Cr. 382, 214 Pac. 1091.

We think this rule is in accord with the principles of justice.

In Swang v. State, 2 Cold. (Tenn.) 212, 88 Am. Dec. 593, it was held:

A "plea of guilty may be withdrawn, and new trial awarded on the affidavit of the defendant with corroborating proof that such plea and the submission of his case were made through fear and official misrepresentations, and in ignorance of his rights."

In State v. Olson, 115 Minn. 153, 131 N. W. 1084, it was held:

"An application to be permitted to withdraw a plea of guilty to a criminal charge after judgment of conviction thereon is addressed to the sound discretion of the trial court."

In Krolage v. People, 224 Ill. 456, 79 N. E. 540, 8 Ann. Cas. 235, it was held:

"The defendant in a criminal prosecution should be permitted to withdraw his plea of guilty when unadvisedly given, where any reasonable ground is offered for going to the jury; and while this is a matter within the discretion of the court, the discretion is a judicial one which should always be exercised in favor of innocence and liberty."

And see People v. Manriquez, 188 Cal. 602, 206 Pac. 63, 20 A. L. R. 1441, and cases collated, annotation p. 1447.

To the same effect see State v. Maresca, 85 Conn. 509, 83 Atl. 635, wherein the court said:

"If the accused * * * pleaded guilty, without fully understanding the significance and effect of his answers, and of his plea of guilty, the judgment and sentence should, under the circumstances, have been opened and the accused permitted to withdraw his plea of guilty."

In a criminal action a defendant has the right to plead guilty, and the effect of such a plea is to authorize a judgment of conviction and imposition of punishment as prescribed by law. The plea should be freely and voluntarily made by one competent to know the consequences, and should not be induced by fear, persuasion, promises, or ignorance. In a certain sense pleas of guilty in criminal proceedings have been discouraged by the courts. In some states pleas of guilty to the charge of murder are not received. In others on a plea of guilty the case must stand continued for judgment and sentence. In still others a jury must be impaneled in capital cases to assess the punishment. However, the uniform holding of the courts is that in capital cases a plea can only be entered after the defendant has been fully advised by the court of his rights and the consequences of his plea. Here there was no attempt whatever on the part of the court to inform the defendant of his rights, or to state the effect of the plea of guilty. The record shows the court asked the defendant Whitley whether he understood, if he pleaded guilty, that it was for the court to either send him to prison for life or to the electric chair, and the mere inquiry to appellant was, "Repeating the same questions I have just asked Mr. Whitley, how do you answer those questions? Just as he did?" appellant answering, "Yes, sir." The court then stated, "You understand, do you, that the consequences are very serious, and, understanding that, you desire to enter a plea

of guilty;" appellant answering, "Yes, sir." This was no explanation whatever of his legal rights on the part of the court.

It should be said in passing and in this connection that appellant by his statement to the court qualified his plea of guilty. Upon the facts as stated by him to the court he was not guilty of the offense charged. It may be stated as a general proposition that no one can be properly convicted of a crime to the commission of which he has never expressly or impliedly given his assent. To hold otherwise would be contrary to natural right and shocking to every sense of justice and humanity. When the accused is present and aiding and abetting another in its commission he may be considered as expressly assenting thereto, so, where he has entered into a conspiracy with others to commit a felony or other crime under such circumstances as will, when tested by experience, probably result in the unlawful taking of human life, he must be presumed to have understood the consequences which might reasonably be expected to flow from carrying into effect such unlawful combination, and also to have assented to the aiding of whatever should reasonably or probably be necessary to accomplish the objects of the conspiracy, even to the taking of life. But further than this the law does not go; for if the accused in such case has not expressly assented to the commission of the crime, and the unlawful enterprise is not of such character as will probably involve the necessity of taking life in carrying it into execution, there can be no implied assent, and consequently no criminal liability. The mere presence of the accused at the scene of the homicide does not make him a criminal; he may have known that a crime was committed, yet, if he did not participate in it directly or indirectly, or encourage the party doing the killing, his mere presence would not constitute him a principal in the

transaction or connect him criminally with the killing. Moore v. State, 4 Okla. Cr. 212, 111 Pac. 822.

All persons are by our laws entitled to a fair trial in absolute freedom from restraint and from fear. It is almost mockery to call that a trial, or a judicial hearing, which condemns an accused upon a plea of guilty, forced from him by fear that to do otherwise would result in his being condemned to death. While promptness in the apprehension and trial of persons accused with crime is commendable, the law has provided how trials should be had, and the enforcement of law is to be arrived at only by adhering to legal requirements and principles of justice and fair trials, as provided by constitutional provisions, legislative enactments, and well-established rule of law.

The facts which are undisputed in this case are that appellant, a poor and friendless 19 year old boy, was placed in jail, and the only communication between him and anybody, after he was placed in jail and until after the judgment of conviction was pronounced, was had with the prosecuting attorneys, officers, and detectives, without friends or advice or the benefit of counsel. It seems he waived his right to a preliminary examination, and was then taken to the courtroom where, without the benefit of counsel or being informed of his rights by the court, he entered a plea of guilty, and was by the judgment of the court sentenced to imprisonment for life at hard labor.

To hold that a conviction, obtained as shown by the record in this case, should be affirmed would be to inaugurate in these latter days that relic of oppression and tyranny known as the "star chamber." Our Constitution and statutes should not receive such construction as would bring about such result. Such construction should be placed upon

constitutional provisions and statutory enactments that do not lead to injustice, wrong and oppression. Such rules of interpretation should be adopted and enforced as will insure to our citizens what the framers of the Constitution intended should be—fairness of trial in a public and open manner, and with due notice, before their lives, liberty, and property are sought to be taken.

Our laws have been made for observance and not for evasion, and it is the duty of trial courts in the administration of the law to see that the accused, whether guilty or innocent, shall have a fair trial according to the due and orderly course of the law, and this duty is emphasized in a capital case.

It has been well said that the law is not designed to be a swift engine of oppression and vengeance, but it was and is designed to try and convict men only after due hearing and a fair trial.

In conclusion we simply add that it is apparent from the record, which we have set out in full, that the overruling of the motion to vacate and set aside the judgment of conviction was a manifest abuse of judicial discretion.

In view of the foregoing, the judgment of conviction is reversed, and the case remanded for proceedings consistent with this opinion.

The warden of the penitentiary will surrender appellant, Charley Polk, into the custody of the sheriff of Oklahoma county, who will keep him in custody until discharged therefrom according to law.

MATSON, P. J., and BESSEY, J., concur.