## ELIJAH BROWN v. STATE.

No. A-5996.   Opinion Filed April 14, 1928.
(266 Pac. 476.)

Madden & Hubbell, for plaintiff in error.

Edwin Dabney, Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, Elijah Brown, hereinafter called defendant, was convicted of rape and sentenced to a term of 50 years in the penitentiary. The facts in the case are as follows:

On the 8th day of July, 1925, a complaint was filed before the county judge of Cotton county, charging the defendant in two counts, the first count charging rape in the first degree, and the second count charging incest, a warrant was issued, and defendant was arrested and placed in the county jail. The defendant was taken before the county judge of Cotton county, and the record discloses that a preliminary trial was set for July 13, 1925, and the defendant was remanded to jail to await the preliminary hearing. On July 9, 1925, for some reason not disclosed definitely by the record, the defendant, Elijah Brown, was

brought before the county judge, and asked the court to certify his case to the district court without delay; the defendant waiving preliminary hearing upon the charge of rape and incest filed against him as having been committed on June 23, 1925. His case was immediately certified to the district court by the county judge, and on the same day, July 9, 1925, an information was filed by the county attorney charging the defendant with rape alleged to have been committed on the 30th day of June, 1925.

The district judge was called from Lawton to Walters and defendant was taken before the district court immediately after the filing of the information, and before a copy of the information had been served upon him, or a list of the witnesses that were to be used against him, and the district court received a plea of guilty of the defendant and sentenced him to 50 years' imprisonment at hard labor in the penitentiary at McAlester.

On the 11th day of September, 1925, there was filed in the district court of Cotton county a motion for a new trial, which motion, omitting the caption, is as follows:

"Comes now the above-named defendant, Elijah Brown, and moves the court to vacate, set aside, and hold for naught the judgment rendered herein on the 9th day of July, 1925, and grant the defendant a new trial for the reasons as follows, to wit:

"Newly discovered evidence, material for the party applying, which he could not, with reasonable diligence, and under the circumstances, have discovered and produced at the trial.

"That on the 8th day of July, 1925, said defendant was charged by complaint in the county court of said above-named county and state, before Hon. Lon Morris, county judge, sitting as a magistrate, with having, on or about the 23d day of June, 1925, committed the crime of rape in the first degree, and incest by separate counts therein, which complaint was duly filed on the 8th day of July, 1925, in

said court, copy of which is hereto attached, marked Exhibit A and made a part of this motion.

"That thereafter on the 9th day of July, 1925, said defendant was taken before the said Hon. Lon Morris, county judge of Cotton county, state of Oklahoma, waiving preliminary trial, and was by said examining magistrate held to wait the action of the district court without bond.

"That thereafter, on the 9th day of July, 1925, an information was filed in the district court against this defendant, charging that on or about the 30th day of June, 1925, he committed the crime of rape in the first degree. A copy of said information is hereto attached, marked Exhibit B and make a part hereof.

"That on the same date, to wit, July 9, 1925, said defendant was taken before Hon. A. S. Wells, the district judge of the above-named county and state, and entered his plea of guilty, and was by the court sentenced to serve a term of 50 years at hard labor in the state penitentiary at McAlester, Okla.; copies of said judgment and sentence being hereto attached, marked Exhibit C and made a part hereof.

"That said defendant was on the same day, to wit, July 9, 1925, taken to the state penitentiary at McAlester, Okla., by C. O. Hooper, sheriff of Cotton county, Okla., and by him delivered at said institution on July 10, 1925, a copy of said receipt and acknowledgment of his deliverance to said penitentiary is hereto attached, marked Exhibit D, and made a part hereof.

"Defendant further alleges and shows to the court that on the day of the alleged crime and for considerable time prior thereto, and at the time of entering his plea of guilty and receiving sentence, he was insane to such an extent that he did not have the mental capacity to distinguish between right and wrong, nor to understand the charges which had been preferred against him; that he was not possessed with sufficient mental capacity to ascertain and know the kind or character of crime of which he was charged, and was on the said 23d day of June and 30th day of June, 1925, insane and totally deprived of the power of reason, and incapable of committing the crime of which he was charged or any other crime.

410

"That upon the date of his arrest, to wit, July 8, 1925, the fact of his insanity and deranged mental condition was called to the attention of the sheriff of Cotton county, Okla., deputy sheriffs and the county attorney of Cotton county, Okla., and was by said county attorney called to the attention of Hon. A. S. Wells, the then district judge of said county, and that his deranged mental condition was so apparent by his appearance and action that the said district judge intimated and expressed some doubt as to his sanity, but neglected to abate said criminal action and inquire into the sanity of the defendant, as required by the law of the state of Oklahoma.

"Defendant further alleges and states that, during the proceedings as herein set out, he was not represented by counsel at any stage of the procedure, was not informed of his rights given him by the Constitution of the state of Oklahoma, was advised and urged to enter a plea of guilty, by the officers holding him in custody, and that such a course would be the very best to take; and on account of his deranged mental condition, and insanity, he was incapable of exercising his judgment or discretion, and easily influenced and followed the advice of the officers without knowing or without mental power to understand the nature of the crime charged in said information.

"Defendant further alleges and states that he is innocent of the crime charged.

"Defendant further alleges that, if granted a new trial, he expects to prove by Mrs. E. K. Brown, his wife, who now resides four miles southeast of the town of Temple, in Cotton county, Okla., that he has been insane for a period of three months prior to July 9, 1925, and at intervals during the past 8 years; that 8 years ago the defendant lost his mind and reasoning entirely, and was insane for a period of 2 years; witness will further testify that the defendant is not guilty as charged in the information; that he did not have sexual intercourse with Ethel Fay Brown, his daughter; that she was present at the time the examination was made by Dr. Alexander of Temple, Okla. and that she afterwards made an examination herself, and that the hymen was not broken, nor was there any bruises or lacerations or any evidence whatever of sexual intercourse.

"If granted a new trial, the defendant expects to prove by another witness, Ethel Fay Brown, that he, at no time, had sexual intercourse with, or carnally knew, her.

"Affidavits of said witnesses Mrs. E. K. Brown and Ethel Fay Brown are hereto attached and made a part of this motion and marked Exhibits E and F, respectively.

"Defendant further shows to the court that he has never at any time, had a preliminary trial, nor has he waived the preliminary trial to the crime of rape, charged in said information, as having been committed on or about the 30th day of June, 1925, for the reason that, being insane, he was incapable of committing a crime of any character, or waiving preliminary, answering or pleading to charge, and that the judgment based upon said information is wholly void.

"Defendant further alleges and shows to the court that, by reason of his insanity, lack of knowledge, and understanding, he was unable to discover the evidence as above set out, prior to his arrest, conviction and delivery to the state penitentiary, which all took place within 48 hours; that, by reason of his insanity and depressed mental condition, he was incapable of exercising judgment and discretion, or to distinguish between right and wrong.

"That the evidence as set out herein and by Exhibits E and F is true; and this motion is made in order that substantial justice might be done, that defendant he dealt with in the manner provided by law, and that he be accorded the inalienable rights of a fair, impartial, and public trial as guaranteed by the Constitution and laws of the state of Oklahoma.

"Defendant further states that at the time of the hearing of this motion he expects to offer the affidavits of other witnesses in support of his motion; that defendant has been insane at intervals during the past 8 years, and will offer other evidence oral and documentary, in support thereof.

"Wherefore defendant prays the honorable court to vacate and set aside the purported judgment and sentence heretofore entered and premit him to withdraw his plea of

guilty and substitute his plea of not guilty, and grant the defendant a new trial.

"(Signed) Madden & Hubbell,
"Attorneys for Defendant.

"State of Oklahoma, Cotton county—SS.:

"Walter Hubbell, of lawful age, being first duly sworn upon his oath, states: That he is one of the attorneys for the defendant, Elijah Brown; that the said Elijah Brown is now confined in the state penitentiary at McAlester, Okla., and is absent from Cotton county at this time; that he has read the within and foregoing motion for a new trial, and has investigated the facts surrounding the arrest and conviction of the defendant; and that all of the allegations therein contained are true according to the best information and belief, and this affidavit is made for and on behalf of the defendant, Elijah Brown, and in his absence from Cotton county, Okla. (Signed) Walter Hubbell.

"Subscribed and sworn to before me this 11th day of September, 1925.

"(Signed) C. S. McCuistion, Court Clerk.
"(Seal). E. E. Myers, Deputy."

This motion was supported by an affidavit of the plaintiff in error in this case, Mrs. E. K. Brown, and Ethel Fay Brown, which said affidavits are as follows:

"Elijah Brown, of lawful age, being first duly sworn on his oath, deposes and says: That he is the defendant above named, who was on the 9th day of July, 1925, sentenced to serve a term of 50 years at hard labor in the state penitentiary at McAlester, Okla., by Hon. A. S. Wells, the then district judge of said county and state, upon a plea of guilty to the crime of rape. Affiant was arrested on the 8th day of July, 1925, was sentenced on the 9th day of July, 1925, and was delivered to the warden of the penitentiary on the 10th day of July, 1925. That affiant is not guilty of the crime charged. That he entered his plea of guilty by virtue of duress, fraud, and undue influence; said acts of fraud, duress and undue influence being as follows, to wit:

"That on the day of defendant's arrest he was placed in the county jail of Cotton county, Okla., and was not permitted to see or talk with anyone except the sheriff, deputy sheriffs, and the county attorney. That the sheriff, C. O. Hooper, deputy sheriff, J. D. Graham, and Toby Morris, county attorney, talked with this affiant numerous times prior to entering his plea. He was told by all of them, 'We have the dope on you, and every one is against you, even your wife and children are against you and will testify against you at the trial; there is no use for you to fight the case, we will convict you anyway, and if you fight the case you are liable to get the death penalty. With every one against you and your wife and children testifying against you, you haven't any chance to come clear, and if you will plead guilty we will recommend 25 years.' Affiant was also advised that there was talk of mob violence against him and it would be the best for him to plead guilty. That affiant told the county attorney that he would like to advise with an attorney before entering his plea, but was advised by the county attorney that he didn't need one, and that he, the county attorney, could and would advise him how to plead guilty, and that it was unnecessary for him to have an attorney.

"Affiant further states that the minds of the inhabitants of Cotton county, and the community in which he resided, were highly inflamed and prejudiced against him, and that there were rumors and demonstrations of mob violence in and around his community and other parts of the county. That shortly after he had been advised by the sheriff's force that there was threatened mob violence, and a short while prior to affiant's plea of guilty, he heard a man talking in the sheriff's office, which is in the front part of the jail, and whom he thinks and believes was a deputy sheriff, and that he said, 'Some of them wanted to come in and get him,' meaning the affiant, 'and they may do it yet.' That defendant was the only person confined in the said jail at that time, and, believing a mob was forming to lynch him, became frightened and was very anxious to be taken away from Cotton county, and believing his life was in danger by reason of the threatened mob violence, and suffering under the fear of losing his life, and under the false impression that his wife and children were against him, and that he had no chance, and under duress, fear, and coercion,

414

he entered his plea of guilty, knowing and aware of the fact that he was not guilty, in order to escape to a place of safety.

"Affiant further states that representations made by the sheriff, deputy sheriffs, and county attorney, to wit, 'We have the dope on you, and every one is against you, even your wife and children are against you and will testify against you at the trial; there is no use for you to fight the case, we will convict you anyway, and if you fight the same you are liable to get the death penalty,' were not true. They were made for the sole and only purpose of intimidating the defendant and inducing and coercing him to plead guilty, and in the law amounts to a fraud. That the county attorney at the time he told the defendant, 'We have the dope on you,' knew that he had no competent evidence to corroborate defendant's plea to the crime of rape in the first degree. The county attorney was informed by Dr. Alexander, of Temple, Okla., who examined Ethel Fay Brown, who it is alleged was raped by this defendant, 'that he could not swear whether she had been outraged or not, that he was unable to find any evidence of it.' Said information was given the county attorney before defendant entered his plea and before defendant was told that 'We have the dope on you.' That Dr. Alexander made the examination of the said Ethel Fay Brown, upon the request of the county attorney and on behalf of the state of Oklahoma. That at the time said representations were made the county attorney well knew that, if the defendant was guilty of any crime, it was that of assault with intent to commit rape.

"Affiant further states that at the time of entering his plea of guilty he was not aware of any act done by him that would constitute the crime of rape, or any other crime, and his plea of guilty was due to duress, fear, fraud, coercion, and misrepresentation of fact.

"Affiant further states that since his conviction, as aforesaid, evidence has been discovered which not only exonerates him, but which proves that the crime of rape was not in fact committed; that by reason of duress, fear, and fraud, as aforesaid, defendant was prevented from discovering said evidence, by due diligence under the circumstances surrounding this affiant at the time and before his

conviction; that said evidence was discovered on July 10, 1925, the day upon which he arrived at the penitentiary, and was disclosed by an examination of the said Ethel Fay Brown by Mrs. E. K. Brown, her mother; that said examination disclosed no evidence of sexual intercourse; that the hymen was not broken, nor was there any evidence indicating that the crime of rape had been attempted.

"Affiant further states that he was prevented from discovering said evidence by reason of misrepresentations, amounting to duress and fraud, and under his fear of mob violence he was incapable of exercising any judgment or discretion. And laboring under the impression that his wife and children were against him, as had been represented, affiant completely lost his power of reason, and was unable by reason thereof, and by coercion, and false representations, to procure counsel, and therefore said evidence was lost to him and could not have been, and was not, discovered until after he was confined in the state penitentiary. Further affiant saith not.

"(Signed) E. K. Brown.

"State of Oklahoma, Pittsburg County—SS.:

"Subscribed and sworn to before me this 2d day of September, 1925.

"(Seal.) (Signed) A. G. Haden, Notary Public.

"My commission expires February 11, 1928."

"Mrs. E. K. Brown, of lawful age, being first duly sworn, states: That I am the wife of the defendant, Elijah Brown; we were married in the state of Alabama, 18 years ago; we have seven children, the oldest one a girl, being 14 years of age; we have resided in Cotton county, Okla., for a period of 4 years; we formerly lived in Heflin, Ala.; my husband is 41 years of age; his mind has been impaired at times during the past 8 years; 8 years ago while we resided at Heflin, Ala., he became mentally unbalanced, and became totally insane and remained so for a period of nearly 2 years, and that since said time he has been mentally deranged during intervals; that during the spring of 1925, commencing during the month of February, 1925, the defendant had been mentally unbalanced, and has gradually grown worse with the coming of hot weather; and

long before his arrest I informed my people and his mother of Heflin, Ala., of his insane condition; that for a considerable time prior to the time of my husband's arrest, he was insane, and did not have the mental capacity to distinguish between right and wrong, or to know what he was doing; he did, on several occasions prior to his arrest, become so deranged that he did not realize the presence of the members of his family; on or about June 1, 1925, he came in the house where affiant and her children were, and without a word, and apparently not conscious of the family's presence, took the bedclothes and mattress from the bed, and went to the different rooms of the house, taking the clothes from the closets and from the shelves, carefully looking and searching every nook and corner, and continued to search the same shelves and closets time after time, and when affiant asked him what he was looking for, he made no reply, but left the house without saying a word to any one, and without realizing that any other person except himself was present; that on the morning of his arrest, July 8, 1925, he came into affiant's bedroom in the early morning and there in her presence took her shoes and stockings and hid them; that defendant has, for a long period of time had a very unnatural appearance, he looked wild, was nervous, physically weak, and mentally sick.

"Affiant further states that during their married life, when at himself, defendant has been a good and most considerate husband toward her, and kind and gentle toward the children.

"Affiant further says that at the time her husband was arrested on July 8, 1925, he was standing in the yard holding their two year old girl; that as soon as the officer made known to her that he was under arrest and charged with a serious crime, she immediately made known to him the fact of his insanity, and immediately upon the arrival of the county attorney and the sheriff of Cotton county, Okla., she made known to them that the defendant was insane, and told them of his strange and unusual actions which had taken place over a period of three months last passed; that after defendant was taken to jail she followed, and informed every one with whom she came in contact of the defendant's insanity, and his mental condition was so apparent by his looks and actions that Toby Morris, the coun-

ty attorney, remarked to this affiant that he looked and acted like an insane man to him.

"Further affiant states that the defendant is not guilty of ever having sexual intercourse with their daughter Ethel Fay Brown on or about the 23d day of June, or on or about the 30th day of June, 1925, or at any time; that she was present and assisted Dr. 'Alexander of Temple, Okla., in making examination of their daughter; that the child would not submit to an examination, stating that nothing was wrong, that her papa had not done anything to her, and, on account of her screaming and fighting, affiant and Dr. Alexander were unable to make or ascertain very much, if anything, and the doctor stated, after the attempted examination, that he could not tell anything about her condition, and could not see anything indicating she had been outraged; that, after the doctor went away, affiant persuaded her daughter to let her make an examination, which she did, and affiant's examination disclosed that the hymen was not broken, nor was there any bruises or lacerations, or any evidence whatsoever of sexual intercourse. Further affiant saith not.        [Signed] Mrs. E. K. Brown.

"Subscribed and sworn to before me this 7th day of September, 1925.

[Signed] T. W. Jenses, Notary Public.

"[Seal.]

"My commission expires April 13, 1926."

"Ethel Fay Brown, after being first duly sworn, states: That she is 11 years of age, and the daughter of Elijah Brown; that Elijah Brown did not have sexual intercourse with me, or carnally know me on or about the 23d day of June, 1925, or on or about the 30th day of June, 1925, or at any other time; Dr. Alexander examined me; I told him nothing was wrong, and he didn't find anything wrong; my father never at any time did anything wrong to me, and I told every one that he did not at the time they took him away.

"[Signed] Ethel Fay Brown.

"Subscribed and sworn to before me this 7th day of September, 1925.

"[Signed] T. W. Jenses, Notary Public.

"[Seal.]

"My commission expires April 13, 1926."

The motion was assigned for hearing on December 21, 1925, and Judge W. L. Eagleton, the regular judge of the Fourteenth judicial district, was assigned by the Chief Justice of the Supreme Court to hear the motion. The defendant in the trial called the district clerk, C. S. McCuistion, and offered the docket showing that in the case of the State v. Elijah Brown, No. 279, the transcript from the county judge sitting as an examining magistrate in his office on the 9th day of July, 1925, was filed, and the information was filed by the county attorney, and the defendant, Elijah Brown, was sentenced to a term of imprisonment of 50 years in the penitentiary at McAlester, for the crime of rape on the same day. The clerk further testified that his recollection was that the defendant was sentenced about 2 or 2:30 in the afternoon, and that Brown's case was the only matter that was taken up that day; that Judge Wells was called down from Lawton for the purpose of receiving the plea; and that the plea was received and the sentence imposed in the court clerk's office.

A number of witnesses were called on behalf of the defendant, who testified to the defendant's peculiar condition and that they believed defendant to be mentally unbalanced at the time he was sentenced and for some time prior thereto.

Judge Lon Morris, county judge of Cotton county, testified that he remembered the occasion of Elijah Brown appearing before him as an examining magistrate; the defendant came to his office in custody of the sheriff; I had information about the case prior to that time; I was informed that he wanted to come in and enter his plea of guilty,

which, of course, he could not do in that court; he wanted to waive preliminary and go into the district court without any delay, and from the offense he was charged with I thought there might be a question as to his sanity, and I interrogated him along that line; when he came to the office I asked him if he knew the nature of the offense and the seriousness of the crime, and he said he did; I asked him if he knew the offense was a capital one in which the court might inflict the death penalty, and he said, "Yes;" I asked him why he was coming in without counsel, and he said he did not feel disposed to employ counsel, and I told him the court would furnish him counsel without cost to himself if he wanted a trial.

Further testifying, the county judge said he appeared rather sunburned, a paleness through his sunburn, and having some question in his mind about his sanity I observed him rather closely. I asked him if he had no defense at all, and he said, "This little girl is not my daughter," and he seemed to rely on that statement as a defense; I informed him that was no defense, except as to the degree of punishment that might be inflicted; I asked him if he was induced to appear by the county attorney or any one, he said, "No; but the county attorney had suggested he would recommend a penalty of 25 years." As a matter of fact I had declined to receive the fellow and his plea until I understood from the county attorney that his recommendation would be 25 years. I decided not to delay the matter and let him proceed through that court without counsel.

In response to questions by the county attorney, he gave the following answers:

"Q. Did any one in your presence at any time in the presence of the defendant make a suggestion that they were going to give him the death penalty? A. No.

"Q. Did the defendant in the conversation there, his general demeanor before you, indicate or cause a doubt, to

arise in your mind as to his sanity? A. No, sir; I didn't see anything there, but I did entertain some question.

"Q. You entertained that before you talked with the defendant? A. Yes, sir; before I saw him."

Witness further testified that after Judge Wells had sentenced the defendant he came to the door of his office, and, while he was talking to Judge Wells, a Mr. Mann came up, who seemed to be somewhat excited, and commenced to tell Judge Wells that he had known the defendant for a number of years, and there must be something wrong, and he must be insane; and Judge Wells was in one of those characteristic poses in which he approached anger, and waved Mr. Mann away—that way—and Mr. Mann said he must be insane. He was confronting me, and I replied, "I thought so too." Judge Wells did not say anything in response to Mr. Mann.

On cross-examination, among other things, the witness in answering the following questions, gave the following answers:

"Q. Now, from the nature of the offense of the crime charged, you wasn't thoroughly satisfied as to his mental condition? A. Yes, sir; from my practice and experience a crime of that kind indicates at least a mania."

Mrs. E. K. Brown, wife of the defendant, was called as a witness and in substance testified that she was at home the day her husband was arrested; that Mr. J. D. Graham informed her that her husband was arrested for a bad thing; that the defendant had been in the field that morning plowing; when Mr. Graham told me my husband had been arrested for a bad thing he did not tell me what it was; I told Mr. Graham my husband's mind was bad; it had been bad for a great while; he had been acting strange, and not acting right for three or four months; he would act like he was looking for something; he would come in the house and take the bed clothing off the bedstead, and when I asked him what he was looking for he would not

say anything and go on not noticing any of us; I visited my husband while he was in jail; the county attorney had been out to my home before I came to see my husband at the jail; I told the county attorney and sheriff that he had been acting strange, and I did not think he was right, and I wanted them to do something for him; Toby Morris stated he looked like a crazy man to him and he believed the man was crazy; that was the first time he came out; I went to see my husband the day he was taken away; it was about 9:30; saw him about 30 or 35 minutes; his mental condition at that time was very weak; he was walking the floor and was so weak he had to catch to the bars; he asked me what he was charged with and I told him it was bothering Ethel, our little girl, and he said he had not done it, and sheriff Hooper said, "My party was ready to go."

Mr. McDavid came into town and defendant wanted him to get an attorney; wanted me to see Judge Lon Morris and get him to tell him where to find an attorney; at that time I did not know whether the defendant was guilty or not; the sheriff told me the county attorney wanted to see me; in my conversation with the county attorney I told him defendant wanted a lawyer, and he said he wondered what he wanted with a lawyer, and I said he wants one, and wants you to get him one, and he said he don't need a lawyer.

I was present when Dr. Alexander made the examination of the little girl down there; the examination was made at my house; Dr. Alexander with Sheriff J. D. Graham and Sheriff Hooper were there; Dr. Alexander stated that he did not find nothing and could not make any statement under that circumstance; he did not find nothing; I assisted him in the examination and I afterwards made an examination of the child; I made the examination the next day after I come up here and seen my husband; the examination disclosed nothing; there was not a thing wrong with the child.

On cross-examination by the county attorney, the wit-

ness Mrs. E. K. Brown stated: I did not tell you and Mr. J. D. Graham and Mr. C. O. Hooper that I knew that this had been going on for a long time and was hoping that some time he would quit doing these things to his family and little girl; witness was then interrogated about a letter that had been received by the county attorney and denied that he had written the letter; witness stated further that I told Mr. Hooper and Mr. Graham that my husband was insane, and had been acting insane, when they first came down there; I told you that he was insane before you had said anything when you first come.

Considerable additional testimony on cross-examination was given by Mrs. E. K. Brown of alleged statements that she should have made to the county attorney, the sheriff, and his deputy. The county attorney was then sworn and testified as to the receiving of a letter purported to have been written by Minnie Brown, route 2, Temple, Okla., and giving evidence that Mrs. Brown had admitted she had written the letter; witness S. E. Cook was called and testified as to having been present with Mr. Morris, the county attorney, when Mrs. Brown admitted a certain letter had been written by her, in which letter statements were made that the defendant was guilty of the charge filed against him.

Witness J. D. Graham, a deputy sheriff, was called and testified as to the arrest of the defendant and that Mrs. Brown at the time the defendant was arrested stated that Mr. Brown had committed a crime on his little girl, and that Mrs. Brown said I will tell you if you will protect me, and Mr. Hooper assured her that they would protect her, and she stated it was a fact; further on the witness stated that Mrs. Brown admitted that it had been going on for several months, and that the girl on whom their father is alleged to have committed the offense stated that the father had committed the offense alleged.

Mr. Cooper, witness for the state, was called and

testified as to statements made by Ethel Fay Brown as to the father having committed the crime, and also Margaret Henderson gave evidence as to what the girl told her about the crime and the method in the commission of the same. There is considerable other testimony of rumors that went around in the neighborhood as to what had been charged against the defendant.

We have set out in this opinion all of the testimony we deem necessary to arrive at a proper and correct decision in this case. The court having heard the evidence in support of the motion for a new trial, and the argument overruled the same, to which ruling of the court the defendant at the time in open court duly excepted and gave notice of appeal, and has assigned the following errors alleged to have been committed by the court in the trial of the case:

"(1) Said court erred in overruling plaintiff in error's motion for new trial, setting aside the judgment, and permitting plaintiff in error to withdraw his plea of not guilty therefore.

"(2) That the proceedings had on defendant's plea and sentence was illegal and void.

"(3) That the judgment and sentence was in violation of the defendant's rights under both the state and federal Constitutions, as guaranteed by sections 2, 6, 9, 17, 19, 20, 21, and 30 of the Bills of Rights, article 2 of the state Constitution, articles 2, 4, 5, 6, 9, and 14 of the Amendments to the Constitution of the United States, and that the defendant has been denied the benefits of counsel and deprived of his liberty without due process of law."

In the Bill of Rights are these provisions:

"Sec. 7. No person shall be deprived of life, liberty, or property, without due process of law."

"Sec. 17. No person shall be prosecuted for a felony by information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination."

"Sec. 20. In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: Provided, that the venue may be changed to some other county of the state, on the application of the accused, in such manner as may be prescribed by law. He shall be informed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf. He shall have the right to be heard by himself and counsel; and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their post office addresses."

In the Code of Criminal Procedure are these provisions:

"When the defendant is brought before a magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and also of his right to waive an examination, before any further proceedings are had." Section 2484, Comp. Stats. 1921.

"He must also allow to the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose; and must, upon the request of the defendant, require a peace officer to take a message to such counsel in the county or city as the defendant may name. The officer must, without delay, perform that duty, and shall receive fees therefor as upon a service of a subpoenas." Section 2485, Comp. Stats. 1921.

"The magistrate must without a jury, immediately after the appearence of counsel, or if none appear and the defendant require the aid of counsel, after waiting a reasonable time therefor, proceed to examine the case," Section 2486, Comp. Stats. 1921.

"At the examination the magistrate must, in the first

place, read to the defendant the complaint on file before him. He must also, after the commencement of the prosecution, issue subpœnas for any witnesses required by the prosecutor or the defendant." Section 2490, Comp. Stats. 1921.

"When the indictment or information is filed, the defendant must be arraigned thereon before the court in which it is filed, if triable therein; if not, before the court to which it is removed or transmitted." Section 2577, Comp. Stats. 1921.

"If the defendant appear for arraignment, without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desire the aid of counsel. If he desires, and is unable to employ counsel, the court must assign counsel to defend him." Section 2590, Comp. Stats. 1921.

"If, on the arraignment, the defendant requires it, he must be allowed until the next day, or such further time may be allowed him as the court may deem reasonable, to answer the indictment or information." Section 2595, Comp. Stats. 1921.

"The court may, at any time before judgment, upon a plea of guilty, permit it to be withdraw, and a plea of not guilty substituted." Section 2621, Comp. Stats. 1921.

"If the defendant refuse to answer the indictment or information by demurrer or plea, a plea of not guilty must be entered." Section 2627, Comp. Stats. 1921.

"After a plea or verdict of guilty, * * * the court must appoint a time for pronouncing judgment."

"The time appointed must be at least two days after the verdict, if the court intend to remain in session so long; or, if not, at as remote a time as can reasonably be allowed." Sections 2759, 2760.

"When the defendant appears for judgment, he must be informed by the court, or by the clerk under its direction, of the nature of the indictment or information, and his plea and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him." Section 2768.

"If no sufficient cause be alleged or appear to the court why judgment should not be pronounced it must thereupon be rendered." Section 2770.

"An appeal to the Criminal Court of Appeals may be taken by the defendant, as a matter of right, from any judgment against him; and upon the appeal, any decision of the court, or intermediate order made in the progress of the case may be reviewed." Section 2805.

It will be observed from the record in this case that the defendant was charged with a grave offense, and that he was taken before a county judge sitting as an examining magistrate, on the 9th day of July, 1925, waived preliminary, and the record was certified to the district court; information filed by the county attorney and the district judge was called from Lawton to Walters to impose a sentence upon the defendant all on the same day.

The defendant in his argument contends that he was deprived of his constitutional rights, in that he was not advised by the court fully as to his right to have counsel represent him, nor was he advised that at least two days before he could be called upon to enter his plea or placed upon trial he was entitled to be furnished a copy of the information and a list of the witnesses to be used against him, and that, if he desired counsel and was unable to employ the same, he would be furnished counsel without cost at the expense of the state.

Under our laws every person accused of a felony is entitled to the aid of counsel at every stage of the proceedings, whether imprisoned or admitted to bail, and the refusal of opportunity to procure such counsel amounts to a deprivation of the rights essential to his safety. Polk v. State, 26 Okla. Cr. 283, 224 P. 194; Sutton v. State, 35 Okla. Cr. 263, 250 P. 930.

In Polk v. State, supra it was held:

"The law favors trials on the merits; and, if the dis-

cretion of the trial court is abused in refusing to vacate and set aside judgment and sentence of life imprisonment, pronounced upon a plea of guilty, and grant a new trial, the judgment on appeal will be reversed." McConnell v. State, 18 Okla. Cr. 688, 197 P. 521; Heath v. State, 23 Okla. Cr. 382, 214 P. 1091.

In Polk v. State, supra, the court further says:

"Under our laws every person accused of felony is entitled to aid of counsel at every stage of the preceedings, whether imprisoned or admitted to bail, and refusal of opportunity to procure such counsel amounts to a deprivation of a right essential to his safety."

It is true that under our law a person prosecuted for a crime may waive the rights guaranteed to him by the Constitution. This court is called upon to say whether or not, under the facts shown in this case, the defendant did or did not waive such rights. The constitutional right of the defendant to be heard by counsel is not limited to the trial, but the provision contemplates the right of the accused to consult with counsel at every stage of the proceedings.

The information in this case charged an offense for which the punishment prescribed by the statute is death, or imprisonment in the penitentiary for 15 years to life. If the defendant had been represented by counsel learned in the law before arraignment, he would have been advised that he had a right to be tried by a jury, and the jury, should he be found guilty, would have a right to fix his punishment at any time in the penitentiary from 15 years to life, or to fix the death penalty; that he could not be compelled to give evidence against himself. He would have been advised that, if he pleaded guilty, the court would be authorized to find him guilty without hearing any other evidence. He would also have been advised that his plea of guilty would waive his right to have a jury exercise its discretion as to the punishment to be imposed on him. He would also have been advised of his right to have furnished him a copy of the

information, and a list of the witnesses for the state, together with their psot office addresses, at least two days before being called on to plead to the information. Goben v. State, 20 Okla. Cr. 220, 201 P. 812, and cases cited.

In Sutton v. State, supra, this court, in construing the second paragraph of section 20 of the Bills of Rights, states:

"That, in a capital case, the defendant does not have to demand a list of the witnesses, together with their post office addresses; that the Constitution makes that demand for him, and, unless he waive it, he cannot be legally put upon trial until that demand has been complied with." Spess v. State, 13 Okla. Cr. 277, 164 P. 131; Goben v. State, 20 Okla. Cr. 220, 201 P. 812; Polk v. State, supra.

In a criminal action the defendant has a right to plead guilty and the effect of such a plea is to authorize a judgment and conviction, and the imposing of the punishment prescribed by law. The plea should always be voluntarily made, and the party charged at the time should be competent to know the consequences and should not be induced by fear, persuasion, promise or ignorance. In some states pleas of guilty, where one is charged with a capital offense, is not received. In others a jury must be impaneled in capital cases to assess the punishment. It is not disputed that many constitutional guaranties may be waived by a person accused of crime, who goes into court represented by counsel and being fully advised of all of his rights. However, it is not clearly shown by the record in this case that the defendant did waive any of his constitutional or statutory rights except so far as his plea of guilty waived his right to be tried by a jury.

This court is of the opinion the constitutional right to be represented by counsel in capital cases, to be furnished a list of witnesses together with their post office addresses at least two days before the case is called for trial, and a copy of the information, are essential to due process of

law granted to a citizen by section 7 of the Bill of Rights. We hold that a conviction had by a denial of the defendant's constitutional rights amount to a denial of due process of law.

It is argued by the Attorney General that, if this case is reversed and remanded for a new trial, the defendant must go free, for the reason that the girl upon whom the crime had been committed, and her mother, have since the conviction of the defendant changed their attitude in the case and that they would now testify that the crime alleged against the defendant had not been committed. This court must examine the record before it and not consider what the result of another trial may be.

The defendant argues that the testimony offered by him in support of his motion for a new trial, and to set aside and vacate the judgment show that no offense had been committed and that he was denied his constitutional rights.

For the reasons hereinabove stated, we are of the opinion the court erred in overruling the motion of the defendant for a new trial, and to set aside and vacate the judgment, and that the judgment and conviction in this case is void for want of due process of law.

The judgment is accordingly reversed, and the cause remanded to the court below for further proceedings consistent with this opinion. The warden of the penitentiary will surrender the defendant, Elijah Brown, into the custody of the sheriff of Cotton county, who will keep him in custody until discharged therefrom according to law.

DOYLE, P. J., concur.

EDWARDS, J., not participating.